**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jorge Edmundo ENRIQUEZ–MUNOZ,**
**Defendant–Appellant.**

**No. 89–10256.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 1989.

Decided June 28, 1990.

Sean Bruner, Ralls & Bruner, P.C., Tucson, Ariz., for defendant-appellant.

Stephen M. McNamee, U.S. Atty., Susan Ehrlich, Reese V. Bostwick, Assistant U.S. Attys., Tucson, Ariz., for plaintiff-appellee.

Before POOLE, REINHARDT and BEEZER, Circuit Judges.

REINHARDT, Circuit Judge:

Enriquez–Munoz appeals a two-year sentence imposed by the district court. He contends that the court used impermissible factors to justify an upward departure from the Sentencing Guidelines. We vacate the excess portion of Enriquez–Munoz's sentence and reduce it to 10 months, the maximum allowable under the Guidelines.

*FACTS*

Enriquez–Munoz pled guilty to one count of aiding and abetting in providing false statements in firearms acquisition, a violation of 18 U.S.C. § 922(a)(6). The false statement he aided or abetted related to the purchase of rifles from a gun shop. Absent the false statement, the purchase of the rifles would not have violated any statute. At sentencing, the district court was provided with a presentence report which included the following facts:

> On December 6, 1988, Enriquez–Munoz met with two men in Tucson, Arizona. The two men agreed to purchase 40 AK 47 rifles with money to be provided by Enriquez–Munoz. Enriquez–Munoz explained that the rifles were destined for Mexico. On that same day, the two men went to Shootist Guns located at 2926 East 22nd Street in Tucson, Arizona. Eight AK 47 rifles, which were in stock, were purchased by one of the men with money provided by Enriquez–Munoz.

> During the next three weeks, Enriquez–Munoz provided money for the purchase of an additional thirty-eight AK 47 and two Galil .223 caliber model arm rifles. He was arrested on December 21, 1988 and, shortly thereafter, police officers recovered 37 of the AK 47 rifles which had been purchased. Police reports indicate the total value of the guns to be $11,100.

Under § 2K2.1 of the Sentencing Guidelines, a person who pleads guilty to a violation of 18 U.S.C. § 922(a)(6) has a base level of 4–10 months; however, Enriquez–Munoz was sentenced to 24 months in prison. The district court held that an upward departure from the Guidelines was warranted because of the number and type of firearms involved, the greed of the defendant and the sentence of a co-defendant.[1] Enriquez–Munoz timely appeals.

---

1. Specifically, the district judge stated his reasons for departing from the Guidelines on the record as follows:

> The court is departing from the Sentencing Guidelines in this case, for a number of reasons—partly because of the other defendants (sic) involved in the sentences—the sentence meted out in that case....

> This gentleman knew exactly what he was doing. He was a contributing and successful member of his local community. There is no reason at all for this offense except greed. The court is appalled at the fact that thirty-seven assault rifles could end up in hands that—where they would be used against law enforcement officials or innocent parties, in either the Republic of Mexico or the United States. I think the crime is just a very serious one.

> The departure from the Guidelines I think is warranted by those facts, together with the

*ANALYSIS*

**I**

We received this case in an all too familiar posture. Enriquez–Munoz had been incarcerated since the date of his arrest. After being sentenced, he appealed the district court's decision to depart from the 4–10 month range provided for in the Sentencing Guidelines. By the time of oral argument Enriquez–Munoz had already been imprisoned for a period in excess of the ten-month maximum. At our conference immediately following the argument, we concluded that because the district court used impermissible factors to justify its departure from the guideline range, Enriquez–Munoz was serving an illegal sentence.

We also decided at our conference that it would be inappropriate for us to prolong the period of illegal detention by remanding the case for resentencing.[2] *Cf. United States v. Hernandez–Vasquez,* 884 F.2d 1314, 1316 (9th Cir.1989). We therefore ordered Enriquez–Munoz's immediate release, subject to the conditions for supervised release as set forth in his sentence. In the order, we stated that this opinion would follow; we now address the merits of the appeal.

**II**

■ Enriquez–Munoz contends that the district court erred by using impermissible factors to justify an upward departure from the Guidelines.[3] We agree. The Sentencing Commission has identified three instances in which departure is appropriate:

first, where the offense committed falls between two different forms of enhancement; second, where the Guidelines provide specific guidance for departure by analogy or by other suggestion; and third, where grounds have not been adequately considered by the Commission. *See* Sentencing Guidelines, ch. 1, pt. A, § 4(b) at 1.7–1.8; *United States v. Nuno–Para,* 877 F.2d 1409, 1413 (9th Cir.1989). In this case, the government argues that departure from the Guidelines was appropriate both because the reasons for the departure were not adequately considered by the Sentencing Commission and, in the case of the equalization of the two defendants' sentences, because the Guidelines provide specific guidance for departure. We now explain why the various factors relied on by the district court cannot justify an upward departure from the Guidelines.[4]

**A.** *Sentence of the co-defendant*

■ The government contends that the district court may properly depart from the 4–10 month range set forth in § 2K2.1 of the Guidelines because Enriquez–Munoz's co-defendant was sentenced to 24 months. The government argues that equal sentences for the defendants are appropriate since they engaged in similar conduct. We reject this rationale.

Enriquez–Munoz's co-defendant was charged with, and confessed to, the additional crime of possessing with the intent to distribute 355 pounds of marijuana. Contrary to the government's assertions, it is simply not the case that the defendants have pled guilty to essentially the same crime. To the contrary, Enriquez–Munoz

---

number of weapons involved, the defendant's complicity, and the defendant's failure to accept responsibility for his acts. Though the failure to accept responsibility does not constitute any grounds for enhancing punishment under the Guidelines.
Transcript of Record, May 17, 1989, at 11–12.

**2.** We first determined that in light of the record in this case no departure from the Guidelines would be warranted.

**3.** Although our resolution of this case would be the same if we were to interpret the current version of the Guidelines, we refer throughout

this opinion to the 1988 version since that version was in effect when Enriquez–Munoz was sentenced. *See United States v. Carvajal,* 905 F.2d 1292, 1294 (9th Cir.1990).

**4.** This is not a case in which the outcome is affected by the standard of review. We assume that the appropriate standard is de novo. *See U.S. v. Gomez,* 901 F.2d 728 (9th Cir.1990) (citing *United States v. Lira–Barraza,* 897 F.2d 981, 983 (9th Cir.1990)). However, whether we apply a de novo standard or a more deferential one, the result is the same. We find the district court's departure from the Guidelines unwarranted.

negotiated a far more favorable plea agreement with the government than did his co-defendant. All but one charge was dropped against Enriquez–Munoz—the charge of aiding and abetting in providing a false statement.

■ What the district court sought to accomplish in this case was to look behind the plea agreements and assess the actual culpability of the defendants. The objective is certainly a laudatory one, even a common-sense one—and in some cases entirely appropriate.[5] However, in this case, there are two other important principles that must also be considered. One lies in the authority given to United States attorneys to negotiate plea bargains. Plea bargaining is a critical tool in the criminal justice system. Without that tool, our courts would be even more overwhelmed than we now are by the flood of criminal cases we are presently experiencing, and will undoubtedly continue to experience for the indefinite future. In fact, we can anticipate that due to the seemingly unending increase in the number of narcotics cases being filed in federal courts—and the seemingly unlimited desire of our lawmakers to federalize the enforcement of our narcotics laws—the current crisis will shortly grow far worse. Were the plea bargaining process to lose its effectiveness as a result of judges' ignoring the benefits of the plea bargain to which defendants are entitled, the consequences for both the criminal and civil justice system might well be disastrous.[6]

The other important principle lies at the heart of the Sentencing Guidelines. The purpose of the Guidelines was to limit the discretion of sentencing judges—to set forth a set of rules that would establish a narrow range within which the court must stay when fixing the actual sentence (subject of course to the right of departure in unusual circumstances). *See United States v. Borrayo*, 898 F.2d 91, 93 (9th Cir.1990) (citing *Nuno–Para*, 877 F.2d at 1412–13). The rationale used by the district court would seriously frustrate that purpose and scheme. Judges would be able to determine a defendant's sentence not just on the basis of what the Guidelines provide with respect to his conduct but also on what they provide with respect to the conduct of any of his co-defendants.[7] There is little indication in the Guidelines that the Commission contemplated so expansive an approach.

■ Equalization is not a factor specified in the Guidelines, nor is it one we can say was overlooked. We can conceive of numerous reasons why the Sentencing Commission might have decided not to make equalization a factor, including the effect that doing so might have upon the plea bargaining process. Defendants would not only have to be concerned with what the Guidelines provide by way of a sentence on the counts they might be willing to plead to; they would have to be equally concerned with what the Guidelines provide for offenses to which their co-defendants might ultimately plead.

The government's reliance on the fact that the Commission "sought uniformity in Sentencing by narrowing the wide disparity in sentences ... for similar criminal conduct" (*see* Sentencing Guidelines, ch. 1, pt. A, § 3) is unpersuasive. The government's

---

**5.** *See, e.g., United States v. Restrepo*, 903 F.2d 648, 653 (9th Cir.1990) (court may look to cumulative amount of narcotics involved in charged and uncharged counts); Sentencing Guidelines § 1B1.3(a)(1).

**6.** Our courts have already experienced the awesome strain that the burgeoning criminal case load can put on the limited resources of our judicial system. *See Armster v. United States Dist. Court*, 792 F.2d 1423 (9th Cir.1986), *motion to vacate denied*, 806 F.2d 1347 (9th Cir.1986). Disregard for the benefits of plea agreements might well force us to revisit the potential con-

stitutional crisis that arises from the shortage of judges and courtrooms, plus inadequate Congressional funding of the judicial system, on the one hand, and on the other, the demands of both the Sixth Amendment, and the related statutory authority implementing the right to a speedy trial in criminal cases, and the Seventh Amendment, which guarantees our citizens the right to civil jury trials.

**7.** We note that we are not required to consider here the appropriateness of such an approach in a case in which the defendant has been convicted of a conspiracy charge.

argument proves too much. The general purpose of the Guidelines must be considered in light of the specific set of rules the Commission adopted, rules that take into account a variety of factors important to the orderly working of the criminal justice system. The uniformity the Guidelines sought was designed to come from the specific provisions of the Guidelines itself, not from giving judges a broad discretion to ignore the Guidelines and increase sentences based on extraneous factors such as the punishment meted out to a co-defendant. As a general proposition, uniformity is a legitimate goal; there are, however, numerous instances where, under the Guidelines, uniformity is unattainable or undesirable. *Cf. United States v. Changa*, 901 F.2d 741, 744 (9th Cir.1990) (different treatment for co-conspirators convicted of different crimes). The case before us presents but one illustration. In short, an upward departure for purposes of equalization is not permissible.[8]

### B. Type of Weapon

■ The government contends that the type of weapon involved should be a permissible factor justifying upward departure for a person convicted of violating 18 U.S.C. § 922(a)(6) because the Sentencing Commission did not adequately consider that factor in establishing § 2K2.1.

The Commentary to § 2K2.1 gives a specific and limited role to the type of weapon in determining the appropriate sentence. The Commentary explains at one point that the Commission has concluded that type of weapon is not a reliable indicator of intent, as one type may be intended for unlawful use as easily as another. United States Sentencing Commission, *Guidelines Manual*, ch. 2, pt. K, § 2, Commentary. However, the Commission also says that the type of weapon is one of the circumstances that may properly be considered in determining whether a *decrease* in the offense level is appropriate. *Id.* Implicitly, the

Commission rejected the use of the type of weapon factor except to the extent that a *reduction* in the offense level was warranted. *Id.*

Given the specific language in the Commentary, it is hard to see how we could justify an upward departure on the ground that in developing the guideline range the Commission did not consider the significance of the type of weapon. Permitting an upward departure on that ground would constitute a de facto reversal of the Commission's judgment that the type of weapon should not play a part in the Sentencing decision, other than with respect to a reduction in offense level. We therefore conclude that the type of weapon involved is an impermissible factor on which to base an upward departure from the Guidelines.

### C. Number of Weapons

■ The district court also justified the upward departure from the guideline range on the ground that the transaction Enriquez–Munoz aided or abetted by providing false statements involved a large number of rifles. The government contends that the number of rifles justifies a departure because the firearms were intended to cause a greater degree of harm than was contemplated by the Guidelines.

The government's argument is not supported by the record, and the district court made no finding that the rifles were intended for an unlawful purpose. Instead, the court merely speculated that the rifles "could end up in hands ... where they would be used against law enforcement officials or innocent parties...." That is true of all rifles. Accordingly, the absence of any evidence or finding that the defendant in fact intended the weapons for such use would be sufficient to cause us to reject the government's argument. *See United States v. Nuno–Para*, 877 F.2d 1409, 1413–14 (9th Cir.1989) (district court's sentence vacated where reasons for departure are unclear).

---

8. We need not consider here whether a downward departure for purpose of avoiding arbitrary, unfair or unequal treatment among co-defendants would be permissible. We note, however, that the issue was not addressed in *Chan-*

*ga.* In that case we decided only that a downward departure for that purpose was not mandatory under the Guidelines. *See Changa,* at 744.

In any event, the number of weapons is not a basis for an upward departure because the Sentencing Commission has adequately considered and rejected the use of number of weapons as a basis for adjusting a sentence under § 2K2.1 of the Guidelines. In this respect, § 2K2.1 is unlike §§ 2K2.2 and 3 which involve closely related offenses, i.e. prohibited transactions in, or transportation of, firearms and other weapons. The latter sections require the court to fix the base offense level on the basis of the number of firearms. In fact, § 2K2.3 sets forth a detailed schedule of stair-step levels based on the precise number of firearms involved. In the case of § 2K2.1 offenses, the Commission did precisely the opposite. It set forth the applicable levels without regard to numbers of weapons, and as in the case of type of weapons, § 2K2.1 provides for consideration of the numbers factor in only one respect. As the Commentary to that section provides, number of weapons, like type of weapons, can be considered for purposes of *reducing* the offense level if the number, along with other circumstances, shows that the weapons were intended for *lawful* use. No provision is made for an *increase* on the basis of numbers under any circumstances. Accordingly, we simply cannot accept the government's suggestion that the Commission did not consider whether the number of weapons should be used to adjust a sentence under § 2K2.1.

The government further argues that departure is warranted because the large number of rifles indicates that Enriquez–Munoz had an illegal purpose that was not adequately considered by the Commission. This argument must also fail. Even if we were to assume that the purpose was illegal—and as we have noted there is neither a finding nor evidence to that effect—an upward departure would not be warranted. Under 2K2.1 of the Guidelines a district court must *decrease* the base level offense if the weapons involved are "ob-

tained or possessed ... solely for sport or collection." The Commentary explains this provision by stating that a decrease is warranted when the circumstances show an intended *lawful* use. Thus, for example, guns obtained for self-protection in a home may well be covered by the amelioratory provision. However, having provided for a decrease in the sentence when the weapons are acquired for lawful purposes, the Commission's failure to provide for an increase when they are acquired for unlawful purposes persuades us that it intended the basic sentence to apply in the latter case. In fact, if intended legal use required a decrease and intended illegal use required an increase there would be little or no purpose or effect left for the basic guideline level. It should not be necessary to remind the government that the basic level is intended to apply to the large majority of offenses. Yet, under the government's theory, the base level set forth in § 2K2.1 might apply to none. In conclusion, the Commentary makes it clear that the fact that the weapons are purchased for use in illegal ventures is not a valid reason for an upward departure in the case of an offense subject exclusively to § 2K2.1.[9]

## D. Greed of the Defendant

Finally, the district court justified its upward departure from the guideline range on the ground that Enriquez–Munoz aided or abetted the making of a false statement in obtaining firearms for no other reason than to satisfy his greed. The government argues that profit motive is an appropriate factor in determining upward departures.

The Commission anticipated that departures from the Guidelines would be rare, (Sentencing Guidelines Ch. 1, Part A, § 4(b); *United States v. Hernandez–Vasquez*, 884 F.2d 1314, 1315 (9th Cir.1989)), yet profit is a primary motivating factor in many if not most types of crimes. Certainly as to crimes in which the desire for

---

9. Our opinion is, of course, limited to offenses covered exclusively under § 2K2.1. As we have noted, closely related transactions involving trafficking in firearms are covered by §§ 2K2.2 and 2K2.3. In fact some offenses are covered under both §§ 2K2.1 and 2. As to weapons transactions that fall under §§ 2K2.2 or 3, the

Commission took a different approach. Numbers of weapons are of great importance in determining the offense level under those subsections. We need not speculate here as to the reason for the variation in approach. It is sufficient that the Guidelines clearly treat offenses covered exclusively by § 2K2.1 differently.

profit commonly plays a role, an upward departure based on the presence of such a motive would be entirely unwarranted. Upward departures can be made only for unusual or extraordinary circumstances, not for routine or run of the mill ones. There is nothing exceptional about the fact that the defendant in this case was interested in making money. When it set the basic offense level for crimes covered by § 2K2.1, the Commission undoubtedly had in mind the fact that people frequently engage in criminal conduct for profit. We therefore hold that an upward departure from the Guidelines was not warranted.[10]

The excess portion of the sentence imposed by the district court is vacated and the sentence is reduced to 10 months, the maximum allowable under the Guidelines.

VACATED IN PART.

---

**10.** We assume, despite the ambiguity in its statement, that the district court did not increase the sentence on the grounds of failure to accept responsibility or "complicity." As the court acknowledged at the time of sentencing, failure to accept responsibility does not constitute a ground for enhancing a sentence. Nor does "culpability." Culpability is the sine qua non of all punishment—not an extraordinary circumstance.