**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Franklin RAY,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**James Franklin RAY,
Defendant–Appellee.**

**Nos. 89–10218, 89–10255.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 17, 1990.

Decided Nov. 23, 1990.

As Amended on Denial of Rehearing,
and Rehearing En Banc April 23, 1991.

Jesse Cordova, Lodi, Cal., for defendant-appellant/appellee.

R. Steven Lapham, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee-appellant.

Before GOODWIN, Chief Judge, KOZINSKI and NOONAN, Jr., Circuit Judges.

GOODWIN, Chief Judge:

James Franklin Ray appeals his conviction for one count of conspiring to manufacture and distribute methamphetamine and one count of manufacturing methamphetamine. He challenges the admission of a welfare fraud investigator's testimony concerning certain documents in his welfare file and contends that there was insufficient evidence to sustain his conviction. We affirm the conviction.

On cross-appeal, the government argues that the district court erroneously departed downward from the sentencing guidelines. The district court departed downward because the Ninth Circuit's invalidation of the guidelines, later reversed by the Supreme Court,[1] resulted in Ray's guidelines sentence being grossly disproportionate to those of his codefendants, who were not sentenced under the guidelines. We affirm the sentence.

Ray and his codefendants were indicted on one count each of conspiring to manufacture and distribute methamphetamine and manufacturing methamphetamine.[2] Ray was also indicted on one count of knowingly maintaining a place for the purpose of manufacturing methamphetamine; this charge was later dismissed on the government's motion.

At trial, the government introduced substantial evidence tending to prove that Ray was closely related to the manufacture of methamphetamine.

The government also introduced evidence that Ray had recently acquired wealth following a period of relative poverty. Welfare fraud investigator Susan Webber testified, over Ray's hearsay objection, that Ray and his family received welfare benefits between November 1985 and November 1987. Government witnesses also testified that during the first half of 1988 Ray made a $6000 cash down payment on a pickup truck and a $3600 down payment on a farm, and paid $11,000 cash for a motorcycle and a $2500 retainer to an attorney.

Prior to Ray's sentencing, the Supreme Court decided *United States v. Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), upholding the constitutionality of

1. *See Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir.1988), *disapproved of in United States v. Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) *and reversed by United States v. Chavez–Sanchez*, 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989).

2. Two other codefendants, Thomas Gene Talk and Jimmy Ray Talk, were also charged in the indictment. Ray's codefendants were also indicted on eleven additional counts. Their convictions and the additional counts are not relevant to this appeal.

the sentencing guidelines. Ray's codefendants had been sentenced during the brief period when *Gubiensio–Ortiz v. Kanahele,* 857 F.2d 1245 (9th Cir.1988), holding that the sentencing guidelines were unconstitutional, allowed the district court to apply pre-guidelines law. Ray had the misfortune to have his time for the imposition of sentence fall after the date of *Mistretta.*

Ray objected to the application of the new sentencing guidelines to his case on *ex post facto* grounds. He also asked the court to depart downward from the guidelines because the sentence mandated by the guidelines was disproportionately long compared to his codefendants' sentences.

The court calculated Ray's sentence under the guidelines to be 262 to 327 months. The court believed that fairness required that Ray receive a sentence more closely proportionate to the sentences of his codefendants. They had received sentences of five to six years imprisonment. The court departed downward from the guidelines and sentenced Ray to twelve years imprisonment on each count, with the sentences to run concurrently, and three years' supervised release.

Ray's Appeal (No. 89–10218)

### 1. *Webber's Testimony*

■ Ray contends that the district court erred in admitting the testimony of Susan Webber, a welfare fraud investigator[3] with the Butte County District Attorney's Office, who testified about the contents of certain documents in Ray's welfare file. He argues that the testimony was not admissible under Fed.R.Evid. 803(6), the business records exception to the hearsay rule,[4] because the foundation requirements had not been established. The evidence was admissible.

Business records are not normally self-proving. For the records to be admissible,

the following foundational facts must be established through the custodian of the records or another qualified witness: (1) the records must have been made or transmitted by a person with knowledge at or near the time of the incident recorded; and (2) the record must have been kept in the course of a regularly conducted business activity. *Kennedy v. Los Angeles Police Dept.,* 901 F.2d 702, 717 (9th Cir.1990).

The phrase "other qualified witness" is broadly interpreted to require only that the witness understand the record-keeping system. *United States v. Franco,* 874 F.2d 1136, 1139–40 (7th Cir.1989); *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir. 1986); 4 Weinstein and Berger, *Weinstein's Evidence,* ¶ 803(6)[02] at 803–178. Here, Webber testified that she was familiar with the filing and reporting requirements for public assistance benefits and the forms used in connection with those requirements. Thus, although Webber was not the custodian of Ray's welfare records,[5] she was a "qualified witness" to establish that Rule 803(6)'s foundational requirements had been met.

■ There is no requirement that the government establish when and by whom the documents were prepared. *United States v. Huber,* 772 F.2d 585, 591 (9th Cir.1985) ("there is no requirement that the government show precisely when the [record] was compiled"); *United States v. Basey,* 613 F.2d 198, 201 n. 1 (9th Cir.1979) (college records properly admitted to establish defendant's address even though the custodian did not herself record the information and did not know who did), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 274 (1980). "All that the rule requires is that the document be made 'at or near the time' of the act or event it purports to record." *Huber,* 772 F.2d at 591.[6]

---

**3.** A welfare fraud investigator investigates allegations of welfare fraud and files criminal charges of welfare fraud with the District Attorney's office.

**4.** The parties do not dispute that Susan Webber's testimony is hearsay.

**5.** The records were, however, in her possession at trial.

**6.** Of course, if the person providing the information in the business record is not acting under a duty of accuracy in the regular course of business, a double hearsay problem may arise. *See e.g., United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983) (recorded calls of witnesses re-

Webber's testimony established the foundational facts necessary for the admissibility of the contents of Ray's welfare files under the business record exception to the hearsay rule. She testified that the CA-2 (application for welfare benefits) and CA-7 (monthly income report) forms in the file, upon which she based her testimony and which she had personally examined, contained information provided solely by the applicant, namely, Ray himself; were reviewed by an eligibility worker; and were required to be contemporaneously filed and maintained in the Welfare Department's file. Accordingly, the district court properly admitted into evidence Ray's welfare records under Rule 803(6).

■ The admission of evidence under a firmly rooted exception to the hearsay rule does not violate the confrontation clause. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *United States v. Baker*, 855 F.2d 1353, 1360 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). The business records exception to the hearsay rule is a firmly rooted exception. *United States v. Norton*, 867 F.2d 1354, 1363 (11th Cir.1989), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *Baker*, 855 F.2d at 1360; *see also Roberts*, 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8 ("'Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions.'") (quoting Comment, 30 La.L.Rev. 651, 668 (1970)). Accordingly, we reject Ray's contention that the admission of Webber's testimony violated the confrontation clause.

II. *Sufficiency of the Evidence*

Ray contends that there was insufficient evidence to support his conviction. We review a challenge to "the sufficiency of the evidence in the light most favorable to the Government to determine if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mason*, 902 F.2d 1434, 1441 (9th Cir.1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

■ The crime of conspiracy consists of three elements: (1) an agreement to accomplish an illegal objective; (2) one or more overt acts in furtherance of the illegal objective; and (3) the intent to commit the underlying substantive crime. *United States v. Thomas*, 887 F.2d 1341, 1347 (9th Cir.1989). The agreement may be inferred from the facts and circumstances of the case. *Id.* Although mere proximity to the scene of illicit activity is insufficient to establish involvement in a conspiracy, a defendant's presence may support that inference when viewed in light of other evidence. *Id.* at 1347–48. "Once a conspiracy exists, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict [the] defendant of knowing participation in the conspiracy." *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987).

■ The evidence introduced at trial strongly supports Ray's conspiracy conviction. Ray does not dispute the existence of the conspiracy to manufacture methamphetamine. Ray's knowledge of and connection with the conspiracy can be inferred from the following evidence: (1) Ray negotiated for the purchase of the backhoe which was found on the Brush Creek property; (2) Ray purchased 30 pounds of Freon on three separate occasions; (3) a respirator mask and an empty Freon container were found at the Powerhouse property, where Ray lived with codefendants Edward Ray and Stephen Giles; and (4) Ray sought information about a generator

porting a crime not admissible because witnesses were not under a business duty to provide information). Although it is unclear whether Ray was under a business duty to provide the financial information to the welfare office, Ray's statements were party admissions and were therefore nonhearsay under Fed.R.Evid. 801(d)(2). Nonhearsay statements recorded in a business record need not have been made under a business duty to be admissible. *See Basey*, 613 F.2d at 201 n. 1.

similar to the one found at the Brush Creek property.

Ray's conviction for manufacturing methamphetamine is supported by the above evidence as well as the following evidence: (1) Ray's residence contained numerous chemicals and equipment used in the manufacture of methamphetamine; and (2) police found a formula for manufacturing methamphetamine in a purse in the master bedroom of Ray's residence.

Viewing the evidence in the light most favorable to the government, *Mason*, 902 F.2d at 1441, the evidence was sufficient to permit a reasonable trier of fact to find that Ray conspired to manufacture and manufactured methamphetamine.

Cross–Appeal (No. 89–10255)

■ The government contends that the district court erred in departing downward from Ray's calculated guidelines range of 262 to 327 months. The district court departed downward from about 27 years to 12 years on the ground that the guideline sentence would be disproportionately long compared to the five to six-year sentences received by Ray's codefendants, who had been sentenced during the Ninth Circuit's temporary refusal to follow the guidelines.

A downward departure is appropriate where "the court finds that there exists ... [a] mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b) (West Supp.1990).

The guidelines permit departures resting upon grounds referred to in Chapter 5, Part K [Departures] or on grounds not mentioned in the guidelines. United States Sentencing Guidelines [U.S.S.G.] Chapter One, Part A at 4(b). The guidelines contemplate that departures resting upon grounds not mentioned in the guidelines "will be highly unusual." *Id.*

Here there are no mitigating circumstances with respect to the criminal conduct, but circumstances unique to this case were "highly unusual." While equalizing sentences among codefendants who are being sentenced under the guidelines was a factor considered by the Sentencing Commission, it is unlikely that the Commission ever contemplated the Ninth Circuit's brief flirtation with rebellion in the *Gubiensio* case.[7]

During the *Gubiensio* aberration, some low sentences, by guidelines measure, were handed out. Ray's codefendants were incidental beneficiaries.

The government asks us to find that the kind of sentencing disparity present here is not a proper consideration in departing downward from the guidelines. This restraint on judicial discretion has caused district judges nationwide to regard the guidelines with less than wholehearted enthusiasm.

The government's position presents in somewhat shabby form the ancient conflict between law and justice. Law tells us that the guidelines are "a comprehensive set of rules that are designed to limit the sentencing court's discretion," and contemplate "that departure will occur only in the unusual case." *United States v. Nuno–Para*, 877 F.2d 1409, 1412–13 (9th Cir. 1989). Justice tells us this is the unusual case presenting a circumstance not taken into consideration by the Sentencing Commission.

" 'In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.' " *United States v. Cervantes Lucatero*, 889 F.2d 916, 918 (9th Cir.1989) (quoting 18 U.S.C. § 3553(b)).

---

**7.** We do not hold that the desire to equalize punishment among codefendants who are all sentenced under the Guidelines is a permissible concern. *Accord, United States v. Enriquez–Munoz*, 906 F.2d 1356, 1358–60 (9th Cir.1990) (suggesting that the Guidelines do not permit upward departures for purpose of equalizing sentences among codefendants); *United States v.*

*Carpenter*, 914 F.2d 1131, 1135–36 (9th Cir.1990) (rejecting the principle that the Guidelines require equal sentences). Rather, we hold that in the unique situation where one defendant is sentenced under the Guidelines while the others are sentenced under a different legal regime, the district court may find "highly unusual" circumstances that support a departure.

Nothing in the sentencing guidelines, policy statements, or official commentary of the Sentencing Commission suggests that the Commission took into account the possibility that the application of the sentencing guidelines would temporarily be suspended, thereby creating a situation where codefendants in the same case and involved in the same underlying criminal activity would be sentenced under conspicuously different sentencing laws.

The need to avoid unwarranted sentencing disparities among codefendants involved in the same criminal activity has long been considered a legitimate sentencing concern. *United States v. Capriola,* 537 F.2d 319, 320–21 (9th Cir.1976). Disparity was said to be one of the most important evils the guidelines were intended to cure. We hold in this case, on these unusual facts, that the district court acted within its discretion in departing downward from the sentencing range mandated by the guidelines.

Once in a while it is well to remember that the life of the law has not been logic; it has been experience.[8] The government's position in this case is undeniably logical. If adopted, it would be a classic triumph of logic over common sense.

AFFIRMED.

KOZINSKI, Circuit Judge, dissenting in No. 89–10255:

### I

Congress has provided that a district court may not depart downward from the range established by the Guidelines "unless ... there exists *[a] mitigating circumstance.*" 18 U.S.C. § 3553(b) (emphasis added). The majority concedes that "here there are *no mitigating circumstances,*" majority op. at 1372 (emphasis added), but nevertheless approves a downward departure.

The majority's candor is to be commended but its jurisprudence is not. Nowhere is it written that a court must apply statutory language except in "highly unusual" circumstances; no principle of law gives a court the power to discard a limitation Congress saw fit to write into the statute. Aphorisms about the advantages of experience over logic—plucked from Justice Holmes' description of the common law—cannot justify defiance of a clear statutory command.

What the majority has done here does comport with a type of rough-and-ready frontier justice and may not seem terribly significant. But the implications of the decision are quite profound. Countless factors might make a particular case appear "highly unusual," calling for a departure—downward or up. For example, the case might have gotten a good deal of publicity exposing the defendant and his family to much abuse; or the defendant might be a public official and the conviction might cost him his job in addition to a criminal sanction; or the defendant might already be in prison on state charges and a long federal sentence might seem like useless piling on. The possibilities are as diverse as human experience, each case vying for our attention as the one where the facts are so "highly unusual" as to justify departure. But Congress has made all of these "highly unusual" circumstances irrelevant unless they also happen to be mitigating or aggravating circumstances.

By dispensing with the threshold inquiry, the majority not only ignores an express congressional command but also strikes a serious blow at the philosophical base on which the Guidelines are founded—the notion of individual culpability. Here the majority allows a downward departure based not on what defendant did or refrained from doing, nor on the extent of harm caused by his criminal activity, nor on his diminished mental capacity or state of duress; in short, not on anything having to do with the defendant at all. Instead, the departure is based on what happened to the defendant's colleagues-in-crime. But would such a circumstance also be a proper basis for departing upward, on the theory

---

8. Oliver Wendell Holmes, *The Common Law,* 1881 (quoted in Shrager and Frost, *The Quotable Lawyer,* p. 172, New England Publishing Associates, Inc., 1986). "Reason is the life of law...." Sir Edward Coke, *The Institutes of the Lawes of England,* vo. 1, 1628–1641 (quoted in Shrager and Frost, *The Quotable Lawyer,* p. 269, New England Publishing Associates, Inc., 1986).

that, if the circumstances are "highly unusual" enough, the statutory limitation on upward departures (that the circumstances must be of an aggravating nature) can be dispensed with? Any such idea defies accepted notions of justice and fair play. Is the case any different because the pinching shoe is on the prosecutor's foot?

When courts take it upon themselves to improve upon statutory language, they often buy themselves a lot of trouble that may not be immediately obvious. Here the trouble will not be long in coming. I predict that *Ray* will quietly breed its own jurisprudence, calling upon us to determine what kinds of circumstances are "highly unusual" enough to emancipate us from statutory strictures. For the benefit of members of the bar who might try and guess how I will exercise this discretion, let the record reflect that I wear a 9½ wide.

## II

My colleagues err a second time. To be a permissible basis for departure, the circumstance must also be one that was "not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). The majority creates a conflict within our circuit by failing to recognize that the Sentencing Commission adequately considered equalizing sentences among co-defendants. In *United States v. Enriquez–Munoz*, 906 F.2d 1356 (9th Cir.1990), we addressed whether a district court could depart upward to equalize the defendant's sentence with those of his co-perpetrators and we said no: "Equalization is not a factor specified in the Guidelines [as a basis for departure], nor is it one we can say was overlooked." *Id.* at 1359. The only difference between *Enriquez–Munoz* and this case is that the district court there departed upward, whereas the district court here departed downward. Surely this can't matter. Whether equalization is the type of factor that would permit the district court to depart from the Guidelines range must have precisely the same answer whether the district court goes up or down; any contrary conclusion renders

"our resulting circuit law ... entirely incongruous." *United States v. Carpenter*, 914 F.2d 1131, 1136 (9th Cir.1990).[1]

In a futile attempt to salvage consistency in the law of the circuit, the majority distinguishes between disparities in sentences among co-defendants "who are all sentenced under the Guidelines" from "the unique situation where one defendant is sentenced under the Guidelines while the others are sentenced under a different legal regime." Majority op. n. 7. But it is not enough to point to a difference in the fact patterns of the two cases; one must also explain why the difference is material for purposes of the legal issue presented. The rationales of *Enriquez–Munoz* and *Carpenter* do not allow for the distinction the majority draws, as should be clear from the fact that the majority does nothing to analyze those cases.

This newly-minted distinction does create the illusion that *Ray* will have little precedential effect: After all, how many cases will there be where some defendants are sentenced under pre-Guidelines law while others are sentenced under the Guidelines? In fact, however, the language the majority uses is not so easily cabined. What do we do, for example, when the disparity occurs because one defendant is subject to a mandatory statutory minimum while his co-defendant receives a straight Guidelines sentence? There, too, one defendant is sentenced under the Guidelines while the other is sentenced "under a different legal regime." Or, consider a defendant who suffers revocation of parole or supervised release in addition to the Guidelines sentence: Would a district judge be entitled to reduce the Guidelines sentence to make his total time served the same as that served by a co-defendant who did not suffer such collateral consequences? Who knows how many other such possibilities for confusion lurk in the nooks and crannies of our sentencing law. The Sentencing Guidelines are complicated enough. I see no justification for adding this layer of complexity as a figleaf to cover up an obvious circuit conflict.

1. The *Enriquez–Munoz* panel purported to leave open the question we answer today. *Enriquez–Munoz*, 906 F.2d at 1360. As demonstrated, however, its reasoning speaks louder than its words.

## III

Perhaps the majority believes that this is not a very significant case, as the specific basis for the departure—a disparity caused by uncertainty surrounding the implementation of the Guidelines—will not be repeated. But the principles by which the departure here is upheld transcend that narrow issue. Our generosity today comes at the cost of ignoring the language of the Guidelines and the law of the circuit; it introduces into sentencing determinations the type of unguided flexibility that is likely to cause us many headaches in the future. I respectfully dissent.