87 F.3d 1325
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose W. YEPEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Miguel ORTIZ, Defendant-Appellant.
 Nos. 94-50182, 94-50188.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 14, 1995.
Decided June 18, 1996.
 
 1
 Before: FLETCHER, CANBY and HAWKINS, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Defendants Jose Yepez ("Yepez") and Miguel Ortiz ("Ortiz") appeal from judgments of conviction on cocaine trafficking charges. Yepez challenges the sufficiency of the evidence for his conspiracy conviction and contends that the trial court committed reversible error in admitting expert testimony on drug trafficking. Ortiz challenges the sufficiency of the evidence for his possession, distribution, and conspiracy convictions and contends that the trial court committed reversible error in failing to give a "multiple conspiracies" instruction.
 
 
 4
 We have jurisdiction, 28 U.S.C. § 1291, and affirm.[1]
 
 BACKGROUND
 
 5
 On June 4, 1992, a federal grand jury returned a 13-count indictment against defendants Yepez, Cuevas, Ortiz, Jose Pinto, Edgar Florez, and Oscar LNU (i.e., last name unknown). All defendants were charged in count one with conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1). Cuevas and Ortiz were charged in count twelve with possession with intent to distribute 935 kilograms of cocaine and in count thirteen with distribution of 935 kilograms of cocaine. Oscar was never apprehended. Pinto and Florez pled guilty to count one. Their sentences were affirmed by this court in United States v. Pinto, 48 F.3d 384 (9th Cir.), cert. denied, 116 S.Ct. 125 (1995).
 
 
 6
 On May 20, 1993, trial of Yepez, Cuevas, and Ortiz began. At trial, the government introduced surveillance testimony of the investigating officers and "expert drug trafficking testimony" consistent with the officers' observations to support its theory that Yepez headed a large-scale, sophisticated cocaine-distribution organization of which Ortiz and Cuevas were members. Anaheim Police Department investigators testified regarding their investigation of defendants and others from February 1, 1992 to March 12, 1992, during the course of which they seized approximately 1120 kilograms of cocaine.
 
 
 7
 On June 10, 1993, defendants were found guilty on all counts. On March 17, 1994, the district court sentenced Yepez to life imprisonment, Cuevas to 292 months imprisonment, and Ortiz to 235 months imprisonment.
 
 DISCUSSION
 A. Sufficiency of the Evidence
 
 8
 Yepez and Ortiz challenge their convictions for conspiracy to possess with intent to distribute and to distribute cocaine on sufficiency-of-the evidence grounds. Ortiz also challenges his convictions for possession and distribution of cocaine as unsupported by sufficient evidence. Yepez and Ortiz do not dispute the existence of a cocaine distribution conspiracy. They contend, however, that the government did not establish beyond a reasonable doubt their connection to the conspiracy. In order to determine whether there was sufficient evidence to convict, this court reviews the evidence in the light most favorable to the government to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 9
 The essential elements of the crime of conspiracy in this circuit at the time of the trial were (1) an agreement to accomplish an illegal objective (i.e., possession with intent to distribute and distribution of cocaine); (2) one or more overt acts in furtherance of the illegal objective; and (3) intent to commit the underlying substantive crime. United States v. Ray, 920 F.2d 562, 566 (9th Cir.1990).[2] The agreement may be inferred from the facts and circumstances of the case. Id. "Once a conspiracy exists, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy." United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987). To uphold the convictions, there must be evidence that defendants had knowledge of the conspiracy and acted in furtherance of it. Mere casual association with conspiring people is not enough. Id. Although mere proximity to the scene of the crime is insufficient to establish involvement, a defendant's presence may support that inference when viewed in light of other evidence. Ray, 920 F.2d at 566.
 
 1. Yepez
 
 10
 The government offered no direct evidence, such as admissions, fingerprints, or taped conversations, connecting Yepez with the conspiracy. Yepez contends that the evidence was insufficient to establish his guilt beyond a reasonable doubt under United States v. Bautista-Avila, 6 F.3d 1360 (9th Cir.1993) (reversing narcotics conspiracy convictions for insufficient evidence), United States v. Ramos-Rascon, 8 F.3d 704, 707 (9th Cir.1993) (same), and other Ninth Circuit authority.
 
 
 11
 We disagree. Although the type of evidence is similar, Yepez's level of involvement and frequency of activity are much greater than those of the defendants in Bautista-Avila and Ramos-Rascon. In Ramos-Rascon, for instance, despite six months of solid investigation, law enforcement officials were unaware until the day of their arrest that the defendants even existed. 8 F.3d at 706. To the contrary, Yepez was seen making approximately 100 phone calls from various pay phones; having clandestine meetings with admitted coconspirators in parking lots and other public locations; putting shocks on a vehicle subsequently used to transport 935 kilograms of cocaine; concealing his identity; and engaging in apparent "countersurveillance" driving during the several months before his arrest while the police were engaged in surveillance. Unlike Bautista-Avila, this was not a case in which Yepez's behavior was "also consistent with that of people who are unwittingly associating with individuals involved in a drug conspiracy." Bautista-Avila, 6 F.3d at 1363.
 
 
 12
 Specifically, the evidence against Yepez included the following: On February 1, 1992, Yepez met with admitted coconspirators Pinto and Florez directly before Pinto and Florez picked up "heavy white looking bundles" at the swap meet. (Four days later the same bundles were discovered to contain 150 kilograms of cocaine.) Yepez travelled to the swap meet from a motel where a room had been rented to him in another's name in a rented van with no license plates taking a route that "appeared to be designed to detect or to allude [sic] anybody that might be following them." At the swap meet, he engaged in apparent countersurveillance, travelling several times through the same intersection as the U-Haul. The next day he went to the residence where the bundles were hidden. Upon leaving, he made multiple u-turns on various streets and periodically sped up and slowed down. The van had no license plate. Several days later, Yepez and Florez met at a street corner, and the next day Florez delivered cocaine at the same corner.
 
 
 13
 From this evidence, the jury could reasonably infer that Yepez planned the cocaine pick-up by Pinto and Florez, was attempting to conceal his identity by staying in a motel registered in another's name and driving a rented van with no license plate, was attempting to avoid law enforcement detection and protect the cocaine pick-up by engaging in countersurveillance driving on the way to and from the pick-up, and went to the "stash house" the next day to check on the cocaine. Cf. United States v. Moreno-Flores, 33 F.3d 1164, 1171 (9th Cir.1994) (holding that defendant's participation in countersurveillance activities at critical times of high risk was sufficient to establish his connection to the conspiracy).
 
 
 14
 Additionally, officers testified that Yepez repaired the gold van used in the March 12, 1992 delivery of 935 kilograms of cocaine, met secretly with Ortiz (one of the drivers) three times before the delivery, drove 50-60 miles round trip to make a single pay telephone call at the exact location where the delivery was made, and met secretly with Cuevas (the other driver) at the same intersection the day before the delivery. A jury could reasonably infer that Yepez planned and organized the cocaine delivery.
 
 
 15
 We conclude that the combination of evidence, while circumstantial, is sufficient for a rational trier of fact to find guilt beyond a reasonable doubt.
 
 2. Ortiz
 
 16
 The evidence connecting Ortiz to the conspiracy and supporting his convictions for possession with intent to distribute and distribution is also sufficient to establish guilt beyond a reasonable doubt. In addition to engaging in three clandestine meetings with Yepez, Ortiz (together with Cuevas) drove the van containing the 935 kilograms of cocaine on March 12, 1992. When Ortiz drove the van to the garage on Burke Street, the top of the van scraped the garage roof and the tires were not flat. Twenty minutes later, Ortiz and Cuevas drove the van out of the garage; the tires were flattened and the van no longer scraped the garage roof. Large objects in the rear cargo area could be seen underneath cardboard boxes. Ortiz and Cuevas drove the van 45 miles per hour on the freeway. They delivered the van to two men via a "car switch." The gold van was driven to an apartment complex and thirty heavy, burlap-texture sacks were unloaded from the gold van into a U-Haul. The sacks were subsequently seized by the police. They contained 935 kilograms of cocaine. The jury could reasonably conclude that Ortiz and Cuevas loaded the van with the cocaine in the garage at Burke Street and delivered it to a buyer.
 
 B. Drug Trafficking Expert Testimony
 
 17
 Yepez contends that the district court committed reversible error by admitting drug profile evidence. This court's review is for an abuse of discretion. United States v. Alonso, 48 F.3d 1536, 1541 (9th Cir.1995).
 
 
 18
 The government's expert, Sergeant Rodig, presented expert testimony on the modus operandi of cocaine trafficking organizations. He explained the various roles held by an organization's members: "manager," "employee," "facilitator." He testified that drugs were often stored in "stash houses"; that "countersurveillance" was a common technique to avoid detection; and that "car switches" were a typical mechanism for transferring drugs. He explained that meetings between coconspirators often took place in-person in public locations such as parking lots, and that pay phones, cellular phones, and pagers were typically used to avoid wiretaps.
 
 
 19
 This court has been critical of the use of "drug profile" evidence as substantive evidence of guilt. See, e.g., United States v. Beltran-Rios, 878 F.2d 1208 (9th Cir.1989).[3] On the other hand, this court has said that drug trafficking "modus operandi" evidence may be admitted to help the jury understand complex criminal activities. United States v. Espinosa, 827 F.2d 604, 611 (9th Cir.1987), cert. denied, 485 U.S. 968 (1988). Such evidence should be used with caution, however, as it can veer perilously close to impermissible profile evidence.
 
 
 20
 Expert testimony may be admitted to explain the significance of seemingly ambiguous, innocent, or otherwise inexplicable conduct. United States v. Alonso, 48 F.3d 1536, 1541 (9th Cir.1995) (reviewing cases and concluding that "[t]hese cases show that a district court may properly allow expert testimony from a law enforcement officer that will help the jury understand how otherwise innocent conduct ... might in fact be consistent with or even indicative of criminal conduct"). Sergeant Rodig testified as to how otherwise innocent conduct, such as switching cars, using pagers, pay phones and cellular phones, conducting meetings in public, and engaging in a certain manner of driving might, under certain circumstances, be consistent with and probative of cocaine trafficking. The district court did not abuse its discretion in admitting Rodig's testimony. Cf. Espinosa, 827 F.2d 604 (upholding introduction of expert testimony regarding use of apartment as a "stash pad"); United States v. Stewart, 770 F.2d 825, 831 (9th Cir.1985), cert. denied, 474 U.S. 1103 (1986) (countersurveillance driving); United States v. Lockett, 919 F.2d 585, 590-91 (9th Cir.1990) (role of participants in drug trafficking organization).
 
 C. Multiple Conspiracies Instruction
 
 21
 Ortiz requested that the district court instruct the jury on evidence of multiple conspiracies with a modified version of Devitt, Blackmar & O'Malley, Federal Jury Practice & Instructions 28.09 (4th ed. 1990). Ortiz's proposed instruction said, in relevant part, "Even if the evidence in the case shows that a defendant was a member of some conspiracy, but that this conspiracy is not the single conspiracy charged in the indictment, you must acquit that defendant. Unless the government proves the existence of the single overall conspiracy described in the indictment beyond a reasonable doubt, you must acquit the defendants."
 
 
 22
 The district court declined to give Ortiz's proposed instruction. Instead, the court gave a standard conspiracy instruction which included the statement that in order for the defendant to become a member of the conspiracy it must be proved beyond a reasonable doubt that "one, the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy. Two, the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired. And three, the defendant has reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture."
 
 
 23
 "A single conspiracy, as distinguished from multiple conspiracies, is 'one overall agreement' to perform various functions to achieve the conspiracy's objectives." United States v. Shabani, 48 F.3d 401, 403 (9th Cir.1995). It is enough for the government to prove that the defendant was involved in a broad project to distribute cocaine and that his benefit depended on the success of the operation. Id. A single conspiracy may include various subgroups or subagreements. United States v. Arbelaez, 719 F.2d 1453, 1457 (9th Cir.1983), cert. denied, 467 U.S. 1255 (1984). Each member of a conspiracy need not know every other member of or be aware of all acts committed in furtherance of the conspiracy. United States v. Taren-Palma, 997 F.2d 525, 530 (9th Cir.1993), cert. denied, 114 S.Ct. 1648 (1994).
 
 
 24
 There was sufficient evidence of a single conspiracy here. All the major cocaine deliveries were packaged in the same fashion and the packaging contained a combination of three distinctive logos: $100 bill, a scorpion, and a polo player. The government's expert testified that cocaine organizations have distinct logos and that the use of the bags and the combination of the logos was unique to the Yepez organization. Yepez's participation throughout the conspiracy, a consistent modus operandi, the fact that the van Cuevas and Ortiz used was registered to the same residence as cars used by Yepez and Florez, and Cuevas's family's involvement throughout also support an inference that there was a single conspiracy.
 
 
 25
 Ortiz contends, nonetheless, that a multiple conspiracies instruction was required because the evidence was also sufficient to conclude that multiple conspiracies existed--one conspiracy among Flores, Pinto, Oscar and possibly Yepez in February and a separate conspiracy among Cuevas, Ortiz, and possibly Yepez in March. He notes that there was evidence of his involvement in only a single drug transaction in March 1992 and that there was no evidence that he ever dealt with Flores, Pinto, and Oscar.
 
 
 26
 This court has described in differing ways the standard to determine when a district court should give a multiple conspiracies instruction. In United States v. Shabani, 48 F.3d 401 (9th Cir.1995), the court described the test as whether, in the light most favorable to the prosecution, any rational juror could have found a single conspiracy beyond a reasonable doubt. Id. at 403. If so, no multiple conspiracies instruction need be given. In United States v. Eubanks, 591 F.2d 513, 518 (9th Cir.1979) (per curiam), by contrast, the court held that "[i]f it is possible under the evidence for the jury to find that multiple conspiracies existed, then the court should instruct the jury on the issue." Id. Eubanks continued,
 
 
 27
 The evidence here was sufficient to support the jury's finding that a single conspiracy had occurred; but it was also sufficient to warrant a jury instruction on the possibility of finding multiple conspiracies.... Thus the trial judge should have instructed the jury on the multiple conspiracy issue.
 
 
 28
 Id. (emphasis added). In United States v. Anguiano, 873 F.2d 1314, 1316 (9th Cir.1988), cert. denied, 493 U.S. 969 (1989), this court explained that "[a] multiple conspiracies instruction is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." The comment to 9th Circuit Model Rule 8.05B says that "[a]bsent variance between the allegations of the indictment and the evidence presented, there is no need to instruct the jury on the issue of multiple conspiracies."
 
 
 29
 Regardless of the standard, we conclude that the district court's failure to give a multiple conspiracies instruction does not constitute reversible error. As the evidence at trial supported the indictment's allegations of a single conspiracy, there was no prejudicial "variance" with the indictment. Although a multiple conspiracies instruction might have been desirable, the instructions given by the district court made clear that the jury could only convict the defendant if it found the defendant to be a member of the conspiracy charged in the indictment. Thus, the jury was not "permitted to convict" Ortiz on a theory not contained in the indictment. See United States v. Patel, 762 F.2d 784, 793 (9th Cir.1985) ("A conviction generally must be reversed if the jury was permitted to convict the defendant on a theory not presented to the Grand Jury or contained in the indictment."). Moreover, there was no prejudicial evidentiary spillover: Ortiz was not charged with Pinto, Florez, and Oscar's substantive crimes on a theory of coconspirator liability and the number of defendants and complexity of the evidence were not so great that the jury was likely to confuse the evidence against Ortiz and the other conspirators. See Anguiano, 873 F.2d 1314 (suggesting that reason to give a multiple conspiracies instruction is to protect against evidentiary spillover). Accordingly, the district court did not commit reversible error in failing to give Ortiz's proposed instruction.
 
 
 30
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In an opinion filed separately today, we affirm the conviction of Yepez and Ortiz's codefendant Jairo Cuevas Alvarez ("Cuevas"). United States v. Cuevas Alvarez, No. 94-50187 (9th Cir.____)
 
 
 [2]
 The Supreme Court has subsequently held that proof of an overt act is not required. United States v. Shabani, 115 S.Ct. 382 (1994)
 
 
 [3]
 The Supreme Court has described "drug courier profile" evidence as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." Reid v. Georgia, 448 U.S. 438, 440 (1979)