**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Roseli BANUELOS–RODRIGUEZ, aka:**
**Rogelio Banuelos–Rodriguez,**
**Defendant–Appellant.**

**No. 96–50297.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 4, 1997

Opinion Filed April 6, 1999

Rehearing En Banc Granted and Opinion Withdrawn Nov. 5, 1999

Argued and Submitted March 21, 2000

Filed June 14, 2000

Carlton F. Gunn, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Miriam A. Krinsky, Jean Rosenbluth, and Terri A. Law, Assistant United States Attorneys, Los Angeles, California, for the plaintiff-appellee.

Before: HUG, Chief Judge, and SCHROEDER, PREGERSON, O'SCANNLAIN, FERNANDEZ, RYMER, KLEINFELD, HAWKINS, THOMAS, GRABER, and FLETCHER, Circuit Judges.

Opinion by Judge GRABER; Dissent by Judge PREGERSON.

GRABER, Circuit Judge:

Defendant Rogelio Banuelos–Rodriguez pleaded guilty in the United States District Court for the Central District of California to illegally reentering the United States after having been deported, in violation of 8 U.S.C. § 1326. At sentencing, Defendant argued for a downward departure from the applicable Sentencing Guideline range on the ground that, had he been arrested in one of the other federal districts in California, he would have been offered a plea bargain that, in turn, would have resulted in a shorter prison term. The district court held that the disparity between the charging and plea-bargaining decisions of the United States Attorney for the Central District and those of the Unit-

ed States Attorneys for the other federal districts in California was not a proper ground for departing from an otherwise applicable Guideline range. Defendant appeals, challenging only that ruling of the district court at sentencing. We affirm.

## BACKGROUND

In August 1995, Defendant was charged in a one-count indictment with being an alien found in the United States after having been deported. Pursuant to a plea agreement, Defendant pleaded guilty to violating § 1326(a) and admitted facts that subjected him to the sentencing enhancement provided by § 1326(b)(2).[1] Specifically, Defendant acknowledged that he had been convicted of an aggravated felony, the sale of rock cocaine, and that he had three additional felonies on his record, including vehicular manslaughter. Under the Sentencing Guidelines, in the absence of departures, the applicable sentencing range was 70 to 87 months.

At sentencing, Defendant argued for a downward departure from the applicable sentencing range based on an alleged discrepancy between the length of sentences received by § 1326 violators prosecuted in the Central District of California and the length of sentences received by § 1326 violators prosecuted in the Southern District of California. According to a newspaper article that Defendant submitted to the district court, previously deported aliens who were arrested in the Southern District of California were eligible for that district's "fast-track" program. *See* Thom Mrozek, *Prosecutions on the Rise: U.S. Attorneys Take Varying Approaches to Illegal Re-Entry*, L.A. Daily J., Sept. 21, 1995, at 1. Under the fast-track program in place at the time Defendant was convicted, "the vast majority of defendants [in the Southern District]—except those convicted of the most violent and depraved acts—[were] offered a deal under Section 1326(a), which carries a statutory maximum sentence of two years in prison." *Id.* at 9.[2] "Those few defendants who face longer prison terms under 1326(b) are offered plea bargains that see their sentences top out at five years." *Id.* The Northern and Eastern Districts of California had adopted similar programs, while the Central District had not. *See id.*

According to the article that Defendant presented to the court, the different charging and plea-bargaining policies that were used in California's different federal districts resulted from individual United States Attorneys' attempts to address the varying illegal immigration problems in their districts. The United States Attorney for the Central District prosecuted only those § 1326 violators with the worst criminal histories and then sought lengthy prison sentences for those convicted. The rationale behind that approach was that the best use of resources, in terms of deterrence and the protection of society, is

---

1. When Defendant was sentenced, § 1326(a) and § 1326(b) were understood to be separate offenses. *See United States v. Gonzalez–Medina*, 976 F.2d 570, 572 (9th Cir.1992). In 1998, the Supreme Court held that subsections (b)(1) and (b)(2) were sentencing enhancements for a violation of § 1326(a). *See Almendarez–Torres v. United States*, 523 U.S. 224, 235, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

2. As noted, Defendant was convicted and sentenced before the Supreme Court decided *Almendarez–Torres*. At that time, most fast-track districts allowed § 1326 violators to plead guilty to a simple violation of § 1326(a), which provided for a two-year maximum sentence, instead of the higher statutory maximums for § 1326(b)(1) and (b)(2). In response to *Almendarez–Torres*, some fast-track prosecutors have altered their programs by allowing persons charged under § 1326 to plead guilty to a violation of 8 U.S.C. § 1325, which carries a statutory maximum sentence of 30 months' imprisonment. *See* Alan D. Bersin & Judith S. Feigin, *The Rule of Law at the Border: Reinventing Prosecution Policy in the Southern District of California*, 12 Geo. Immigr. L.J. 285, 310 n. 26 (1998). Under both the past and the present regimes, prosecutors in fast-track districts are agreeing, in return for a guilty plea, to seek conviction for an offense that carries a lower sentence under the Guidelines.

achieved by incapacitating for long periods of time those aliens who pose the greatest threat of committing future harm. *See id.* at 9.

On the other hand, again according to Defendant's proffer, the United States Attorney for the Southern District decided to prosecute more § 1326 violators but to seek shorter prison sentences for most of those convicted. The Southern District's fast-track program allowed the government to secure a large number of convictions with relatively little use of its resources. In most cases, under the fast-track program, the alien agreed to plead guilty before indictment, stipulate to deportation, and waive all rights to appeal the sentence. *See id.; see also United States v. Estrada–Plata,* 57 F.3d 757, 759 (9th Cir.1995) (describing the fast-track program of the Southern District of California).

After considering this argument about sentencing disparity, the district court denied Defendant's motion for a downward departure. The court held that this disparity is not a proper ground for departure: "[I]f the court accepts whatever has been bargained and then sentences pursuant to the guidelines, then I don't see how any disparity in the plea bargain charging [among] the various districts adds up to a downward departure factor." The court then sentenced Defendant to 70 months' imprisonment, at the bottom end of the Guidelines range, and three years of supervised release. On appeal, Defendant contends that the district court erred in holding that it had no discretion to grant him a downward departure to equalize his sentence with the sentences of aliens with similar criminal backgrounds who, at the time of Defendant's sentencing, were found in the Southern District of California after having been deported.

## STANDARD OF REVIEW

■ We review for abuse of discretion a district court's decision about departure from a Guidelines sentence:

[W]hether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point.... [A]n abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law.

*Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (citation omitted).

## DISCUSSION

1. *Application of the Sentencing Guidelines*

Defendant was convicted of violating 8 U.S.C. § 1326. The applicable Sentencing Guideline for a violation of that statute is U.S.S.G. § 2L1.2,[3] which provides:

**Unlawfully Entering or Remaining in the United States**

(a) Base Offense Level: 8

(b) Specific Offense Characteristics

If more than one applies, use the greater:

(1) If the defendant previously was deported after a conviction for a felony, other than a felony involving violation of the immigration laws, increase by 4 levels.

(2) If the defendant previously was deported after a conviction for an aggravated felony, increase by 16 levels.

(Boldface type in original.)

Pursuant to the terms of his plea agreement, Defendant admitted that he had been deported after a conviction for an aggravated felony. Therefore, the district court properly calculated Defendant's offense level as 21 (Base Offense (8) + Specific Offense Characteristics (16)—Ac-

---

**3.** All references are to the November 1, 1995, version of the Sentencing Guidelines.

ceptance of Responsibility (3) = 21). Given Defendant's criminal history category of V, the resulting sentencing range is 70 to 87 months' imprisonment. *See* U.S.S.G. Ch. 5, Pt. A. The district court sentenced Defendant at the low end of that range.

Defendant does not contest that he violated § 1326(a) and was eligible for the aggravated-felony enhancement under § 1326(b)(2). Nor does Defendant contest that U.S.S.G. § 2L1.2, by its plain terms, applies to his offense of conviction. Nor does Defendant quarrel with the district court's arithmetic.

### 2. *"Mitigating Circumstance"*

By statute, a district court may not depart from an applicable Guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Defendant contends that the disparity between the sentences received by similarly situated aliens in the Central District versus the Southern District is a mitigating circumstance that the Commission did not adequately take into consideration when it formulated the Guidelines.

The sentencing disparity at issue here results from policy choices made by different United States Attorneys in their respective districts. At the time that Defendant was sentenced, the United States Attorney in the Central District opted to concentrate on prosecuting those "worst" § 1326 violators who could be sentenced under § 1326(b). By contrast, the United States Attorney in the Southern District chose to prosecute more § 1326 violators and then offer the majority of them an opportunity to plead to a lesser offense. As a result, it was more likely that an illegal alien who was eligible for the enhancement provided by § 1326(b) would be sentenced under § 1326(b) if the alien was apprehended in the Central District.

We fail to see how the decision of the United States Attorney for the Southern District of California to pursue a particular prosecutorial policy in dealing with § 1326 violators in that district can be a "mitigating circumstance" with regard to Defendant or his crime. *Cf. United States v. Ray*, 930 F.2d 1368, 1373 (9th Cir.1991) (Kozinski, J., dissenting) (noting that, although the situation in which one co-defendant is sentenced under the Guidelines and another is sentenced during a period when the Ninth Circuit rejected the Guidelines may be "highly unusual," it is not a "mitigating circumstance"). Nothing about the Southern District's "fast-track" program lessens the severity of Defendant's conduct or makes his criminal or personal history more sympathetic. The fact that, had Defendant been apprehended in the Southern District, he might not have been punished to the fullest extent of the law, does not make his otherwise lawful sentence less justified. Thus, the existence of differing prosecutorial policies regarding § 1326 violators is not a "mitigating circumstance."

### 3. *The Guidelines' "Heartland" Analysis*

Even if differing prosecutorial policies could be considered a mitigating circumstance within the meaning of the statute, the Guidelines themselves would preclude granting a downward departure based on a disparity of this nature. The commentary to the Guidelines provides in part:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the *conduct* that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where *conduct* significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt. A, Intro. p.s. 4(b), at 5–6 (emphasis added). When defining the heartland of a particular offense, the "[Su-

preme] Court has explained that the proper comparison is between the conduct of the defendant and the conduct of other offenders" who have been convicted of committing the same offense. *United States v. Stevens,* 197 F.3d 1263, 1268 (9th Cir.1999) (citing *Koon,* 518 U.S. at 104–05, 116 S.Ct. 2035); *see also United States v. Sanchez–Rodriguez,* 161 F.3d 556, 561 (9th Cir.1998) (en banc) (providing that, to determine the heartland, a district court is to compare the defendant's conduct with that of all defendants who are sentenced under the same Guideline). As noted, Defendant and his conduct fall squarely within the heartland of his offense of conviction.

The purpose of the Sentencing Commission was to establish Guidelines that "avoid[ ] unwarranted sentencing disparities among defendants with similar [criminal] records who have been *found guilty* of similar criminal conduct." 28 U.S.C. § 991(b)(1)(B) (emphasis added). In drafting the Guidelines, the Commission "sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. Ch. 1, Pt. A, Intro. p.s. 3, at 2.

In other words, the Guidelines have sought to achieve uniformity in sentencing only by attempting to equalize the sentences of those who have engaged in similar criminal conduct, have similar criminal backgrounds, *and* have been convicted of the same offense. "The uniformity the Guidelines sought was designed to come from the specific provisions of the Guidelines itself, not from giving judges a broad discretion to ignore the Guidelines and increase [or decrease] sentences based on extraneous factors such as the punishment meted out to" those convicted of other offenses. *United States v. Enriquez–Munoz,* 906 F.2d 1356, 1360 (9th Cir.1990).

Here, Defendant agreed to plead guilty to violating § 1326(a) and to admit facts making him eligible for the enhancement provided by § 1326(b)(2). An alien who merely pleads guilty to a simple violation of § 1326(a) and an alien who pleads guilty to violating § 1326(a) *and* also admits facts demonstrating eligibility for the enhancement under § 1326(b)(2) are not pleading "guilty to essentially the same crime." *Id.* at 1358. In the former case the alien is pleading guilty to being in this country illegally after having been denied admission, excluded, deported, or removed. *See* 8 U.S.C. § 1326(a). In the latter case, the alien is pleading guilty to being in the United States illegally after conviction of an aggravated felony. *See* 8 U.S.C. § 1326(b)(2). Granting a downward departure on the ground that Defendant received a longer sentence than other defendants who have been convicted of committing a different crime would be inappropriate.

Additionally, allowing sentencing departures grounded on the length of sentences received by others who engaged in similar conduct but were convicted of different offenses would require courts to "look behind ... plea agreements and assess the actual culpability of ... defendants." *Enriquez–Munoz,* 906 F.2d at 1359. Not only would this process impinge on prosecutors' discretion in charging and plea bargaining, it also would require sentencing courts to conduct involved and cumbersome evidentiary hearings. There is no support for the contention that the Commission intended the Guidelines to produce such effects.

4. *"Highly Infrequent"*

Although the Commission recognized that departures from a Guidelines sentence, on grounds not mentioned in the Guidelines themselves, may be warranted, it expected that such departures would be "highly infrequent." U.S.S.G. Ch. 1, Pt. A, Intro. p.s. 4(b), at 6; *see also Koon,* 518 U.S. at 96, 116 S.Ct. 2035 (so stating). If the district court for the Central District could depart downward for all aliens convicted of violating § 1326(a) who are eligible for the subsection (b)(2) enhancement, on the ground that they would receive

longer sentences than illegal aliens with similar criminal histories in another district, departures would not be "highly infrequent." Instead, they would be highly frequent. Moreover, logically under Defendant's theory, a defendant sentenced in the District of Alaska or the District of Arizona could make the same argument as Defendant here, or could bring in evidence of charging and plea-bargaining practices in the District of South Carolina or the District of Maine.[4]

### 5. The Guidelines' Treatment of Prosecutorial Discretion

To determine whether the Commission adequately considered a certain possible factor for departure, courts are to "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b). Those portions of the Sentencing Guidelines that address prosecutorial discretion support our conclusion that departure is not permissible based on differing legitimate policies of United States Attorneys.

■ First, the Guidelines provide that "a sentencing court may control any *inappropriate* manipulation of the indictment through use of its departure power." U.S.S.G. Ch. 1, Pt. A, Intro. p.s. 4(a), at 5 (emphasis added). By implication, the sentencing court may not use its departure power to impinge on a prosecutor's legitimate exercise of discretion in charging a defendant.

Second, a sentencing court has the power to reject a plea agreement if it determines that the agreement does not "adequately reflect the seriousness of the actual offense behavior [or] that accepting

the agreement will ... undermine the statutory purposes of sentencing or the sentencing guidelines." U.S.S.G. § 6B1.2(a). The wording of that provision suggests that a court may accept or reject a plea agreement at the outset, but is not free to accept a plea agreement and then depart based on the inadequacy of that agreement. Moreover, the commentary to that section cautions that the power of a court to reject a plea agreement "does not authorize judges to intrude upon the charging discretion of the prosecutor." U.S.S.G. § 6B1.2 comment., at 322.

As those provisions make clear, the Commission considered the effects that the exercise of prosecutorial discretion has on the uniformity of sentences. The Guidelines allow sentencing courts to take certain limited actions in narrow circumstances to address a prosecutor's inappropriate exercise of discretion. In all other circumstances, the Guidelines do not give courts the authority to interfere with a prosecutor's exercise of discretion in charging and plea bargaining by departing from an applicable Guideline range.

Defendant does not argue that the prosecutor inappropriately manipulated the charges against him or that his plea agreement fails to reflect the seriousness of his crime. Accordingly, the Guidelines required the district court to impose a sentence consistent with Defendant's offense of conviction. *See United States v. Thomas,* 884 F.2d 540, 544 (10th Cir.1989) ("[The defendant] contends further that, under the guidelines, the prosecutor can control the length of a defendant's sentence by management of the charging of offenses and plea bargaining practices.

---

4. This possibility is more than speculative. In *United States v. Bonnet–Grullon,* 212 F.3d 692 (2d Cir.2000), the defendants pleaded guilty to reentering the United States after having been deported following conviction of an aggravated felony. *See* 8 U.S.C. § 1326(a) & (b)(2). They argued that the United States District Court for the Southern District of New York should have considered a down-

ward departure on the basis of the policy followed by the United States Attorney's Office in the Southern District of California. The Second Circuit held, as we do here, that the district court "lacked the authority to depart on the basis of that interdistrict sentencing disparity," which results from the exercise of prosecutorial discretion. *Id.* at 693.

[The defendant] does not show, however, how his rights were violated in this way. [The defendant] was convicted as charged following a one-count indictment; he offers no evidence of bad faith or discrimination on the part of the prosecutor at any time during the criminal proceedings."), *reasoning adopted in United States v. Fuentes,* 925 F.2d 1191, 1193 (9th Cir.1991) ("We agree with the Tenth Circuit and adopt its analysis. The Sentencing Guidelines do not unconstitutionally enlarge the prosecutor's influence over sentencing.").

Additionally, although it is indisputable that the goal of federal sentencing reform was the elimination of unwarranted sentencing disparity, a review of the legislative history suggests that the disparity that Congress sought to eliminate did not stem from the exercise of prosecutorial discretion. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 38, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221 ("These disparities ... can be traced directly to the unfettered discretion the law confers on those judges and parole authorities responsible for imposing and implementing the sentence."). In fact, one of the primary criticisms of the Guidelines was that the sentencing regime would "simply shift discretion from sentencing judges to prosecutors." *Id.* at 3246. Thus, it cannot fairly be said that Congress was seeking to reduce sentencing disparities arising from the exercise of prosecutorial discretion when the legislation that it enacted would, if anything, enhance that discretion. Congress was aware that the Guidelines would shift discretion to prosecutors and decided that judicial review of plea agreements would sufficiently alleviate problems in this area. *See id.* ("The concern is that the prosecutor will use the plea bargaining process to circumvent the guidelines recommendation.... The bill contains a provision designed to avoid this possibility. Under proposed 28 U.S.C. § 994(a)(2)(D), the Sentencing Commission is directed to issue policy statements for consideration by Federal judges in deciding whether to accept a plea agreement.

This guidance will assure that judges can examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines."). In sum, the legislative history of the Guidelines also supports our conclusion that sentencing disparities arising from the charging and plea bargaining decisions of different United States Attorneys is not a proper ground for departing from an otherwise applicable Guideline range.

### 6. *Separation of Powers*

■ In *Enriquez–Munoz,* we noted that allowing a district court to depart in order to equalize the sentences of defendants who had pleaded guilty to committing different crimes (even if they had engaged in similar conduct) would implicate "the authority given to United States attorneys to negotiate plea bargains." 906 F.2d at 1359. Courts generally have no place interfering with a prosecutor's discretion regarding whom to prosecute, what charges to file, and whether to engage in plea negotiations. *See United States v. LaBonte,* 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ("[T]he discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect[ ] ... is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors."); *see also United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws.... In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.") (citations and internal quotation marks omitted); *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) ("Such factors as the strength of the case, the prosecu-

tion's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.").

We repeatedly have echoed that theme. *See United States v. Duran,* 41 F.3d 540, 544 (9th Cir.1994) ("If the prosecutor has probable cause to believe a defendant committed a crime, the decision of whether to prosecute and the charges to be filed rests with the prosecutor."); *United States v. Oakes,* 11 F.3d 897, 899 (9th Cir.1993) ("[W]e have no jurisdiction to review prosecutors' charging decisions, absent proof of discrimination based on suspect characteristics such as race, religion, gender or personal beliefs. This is true, even where the prosecutor's decision ... was motivated primarily by a desire to impose a harsher sentence, and was inconsistent with the treatment given other defendants.... [A] 'wide disparity' between sentencing schemes of different jurisdictions does not violate equal protection, even where two persons who commit the same crime are subject to different sentences.") (citations omitted); *United States v. Palmer,* 3 F.3d 300, 305 (9th Cir.1993) ("[S]eparation of powers concerns prohibit us from reviewing a prosecutor's charging decisions absent a prima facie showing that it rested on an impermissible basis, such as gender, race or denial of a constitutional right.") (footnote omitted); *United States v. Redondo–Lemos,* 955 F.2d 1296, 1299 (9th Cir.1992) ("Prosecutorial charging and plea bargaining decisions are particularly ill-suited for broad judicial oversight.... Such decisions are normally made as a result of careful professional judgment as to the strength of the evidence, the availability of resources, the visibility of the crime and the likely deterrent effect on the particular defendant and others similarly situated.") (citation and footnote omitted).

Defendant has not alleged, nor is there any evidence in this record that tends to show, that any of the policies implemented and pursued by the United States Attorney for the Central District were based on impermissible factors such as racial or religious animosity. Quite the opposite appears to be true. According to the materials that Defendant himself presented, the United States Attorneys' differing policies appear to have been considered attempts to address the unique illegal immigration problems faced by their individual districts.

Defendant's argument that the Guidelines' basic goal of uniform *sentencing* should be served by uniform *charging practices* must be made to the executive, not the judicial, branch. Judicial respect for prosecutorial discretion militates in favor of holding that courts may not depart from an applicable sentencing range on the ground that, had the defendant been prosecuted in another federal district by a different prosecutor, the defendant would have been able to negotiate a more favorable bargain.

### 7. Ninth Circuit Precedent

Finally, our prior decisions in analogous circumstances support the conclusion that a disparity of this kind cannot be the basis for a downward departure. In *Enriquez–Munoz,* the defendant had pleaded guilty to aiding and abetting an 18 U.S.C. § 922(a)(6) violation by providing false statements in acquiring firearms. *See* 906 F.2d at 1357. The applicable Sentencing Guideline provided for a prison term of four to ten months. The district court, however, departed upward and sentenced the defendant to 24 months' imprisonment. *See id.* at 1357–58 & n. 1. The district court based its upward departure in part on the fact that a co-defendant had been sentenced to a 24–month prison term. *See id.* The government argued that it was appropriate for the district court to depart upward to equalize the sentences of the defendant and his co-defendant, because they had engaged in similar underlying criminal conduct. *See id.* at 1358. This court disagreed and held that the district

court could not impose an upward departure to equalize the defendant's sentence with that of his co-defendant, because the two defendants had not "pled guilty to essentially the same crime. To the contrary, [the defendant] negotiated a far more favorable plea agreement with the government than did his co-defendant." *Id.* at 1358–59.

Similarly, in *United States v. Carpenter*, 914 F.2d 1131 (9th Cir.1990), the court affirmed a district court's upward departure that created a sentencing disparity between the sentences of co-defendants. The court noted that, for the same reason that a sentencing disparity could not justify an upward departure, a sentencing disparity did not preclude an upward departure if the departure was otherwise justified. *See id.* at 1135–36.

In *United States v. Mejia*, 953 F.2d 461, 467 (9th Cir.1992), the defendant argued "that he should be granted a downward departure from the Sentencing Guidelines because his relative lack of culpability in comparison with [his co-defendant was] a mitigating circumstance not adequately taken into consideration by the Sentencing Commission." However, this court held that a district court cannot depart for the purpose of avoiding unequal treatment of co-defendants. *See id.* at 468 ("Basic notions of fairness dictate that defendants should be sentenced in proportion to their crimes.... A downward departure to correct sentencing disparity brings a defendant's sentence more into line with his or her codefendant's sentence, but places it

out of line with sentences imposed on all similar offenders in other cases.").

In sum, *Enriquez–Munoz, Carpenter,* and *Mejia* stand for the proposition that the equalization of sentences is an improper ground for departure if the court is attempting to equalize the sentences of co-defendants who are *convicted* of committing *different* offenses, even if their behavior was similar. We see no reason to limit that principle to cases involving the sentences of co-defendants.[5] We hold that a district court may not grant a downward departure from an otherwise applicable Guideline sentencing range on the ground that, had the defendant been prosecuted in another federal district, the Defendant may have benefited from the charging or plea-bargaining policies of the United States Attorney in that district.

AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

I dissent. The crucial issue is whether a district court has discretion under the Sentencing Guidelines to *consider* a downward departure because disparate *district-wide* plea-bargaining policies of U.S. Attorneys' Offices in contiguous federal districts in Central, Eastern, Southern, and Northern California have created unjustified sentencing disparities for violations of 8 U.S.C. § 1326 by the most serious offenders. The district court concluded that it did not have such discretion. The majority opinion affirms. I would reverse.

I believe that a district court has such sentencing discretion. Departures based

5. We recognize that, in *United States v. Ray*, 930 F.2d 1368 (9th Cir.1991), we approved a downward departure to correct a disparity between the sentences of co-defendants. In that case, however, the sentencing disparity was created when certain defendants were sentenced under the Guidelines and other defendants were sentenced during the brief period in which the Ninth Circuit had declared the Guidelines unconstitutional. *See Gubiensio–Ortiz v. Kanahele,* 857 F.2d 1245 (9th Cir. 1988) (declaring the Sentencing Guidelines unconstitutional), *overruled by Mistretta v.*

*United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The holding in *Ray* has been limited to the rare situation in which certain co-defendants are sentenced under the Guidelines while others are not. *See United States v. Mejia,* 953 F.2d 461, 468 n. 2 (9th Cir.1992) (so stating); *see also United States v. Boshell,* 952 F.2d 1101, 1107–08 (9th Cir. 1991) (approving a district court's downward departure where certain co-defendants were sentenced before, and others were sentenced after, the Guidelines took effect).

on the distorting effect that disparate district-wide plea-bargaining policies have on sentences for illegal re-entry are neither "forbidden," "encouraged," nor "discouraged" by the Sentencing Guidelines. *See Koon v. United States,* 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). To the contrary, intracircuit sentencing disparities—whether the result of disparate judicial interpretations of a guideline or prosecutors' disparate district-wide plea-bargaining policies—defeat the fundamental purpose of the Sentencing Guidelines: "reasonable uniformity in sentencing" among federal districts. U.S.S.G. ch. 1, pt. A, intro., p.s. 3, at 3.

Moreover, I believe that the majority opinion errs as a matter of law in "categorically" banning departures on this or any basis. *See United States v. Sanchez–Rodriguez,* 161 F.3d 556, 560 (9th Cir.1998) (en banc) ("[W]e cannot categorically forbid a district court from departing downward on any basis except those specifically proscribed by the Guidelines."); *see also Koon,* 518 U.S. at 106–07, 116 S.Ct. 2035 ("[F]or the courts to conclude a factor must not be considered under any circumstances would be to transgress the policymaking authority vested [by Congress] in the [Sentencing] Commission.").

Accordingly, I would hold that the district court erred as a matter of law in concluding that the departure requested was legally precluded by the Sentencing Guidelines and remand for the district court's reconsideration. *Cf. United States v. Karlic,* 997 F.2d 564, 567–68 (9th Cir. 1993) (stating that the incorrect application of the guidelines requires remand so that the district court may properly exercise its discretion).

## ANALYSIS

### A. The Standardized, District–Wide Plea–Bargaining Policies

As the majority opinion explains, the U.S. Attorneys' Offices in the contiguous Southern, Eastern, and Northern Districts of California have adopted a "fast-track" plea-bargaining program for aliens charged with illegally reentering the United States in violation of 8 U.S.C. § 1326. *See* Majority Op. at 971; *see also* Thom Mrozek, *Prosecutions on the Rise: U.S. Attorneys Take Varying Approaches to Illegal Re–Entry,* L.A. Daily J., Sept. 21, 1995, at 1, 9 ("Mrozek"). Under the fast-track program, "the vast majority of defendants—except those convicted of the most violent and depraved acts—are offered a deal under § 1326(a), which carries a statutory maximum sentence of two years in prison." *Id.* Those offered the two-year deal include defendants who are in the top two criminal history categories of the Sentencing Guidelines (i.e., categories V and VI). *See id.* "Those few defendants who face longer prison terms under [§ ] 1326(b)[ (2) because of a past aggravated felony conviction] are offered plea bargains that see their sentences top out at five years" or 60 months. *Id.* at 9.

The U.S. Attorneys' Office in the neighboring Central District of California, however, has chosen not to adopt this fast-track plea-bargaining policy. *See id.* Instead, it purportedly has decided to prosecute only the "worst" § 1326 offenders. This includes those aliens illegally reentering the United States who were previously deported after receiving any felony conviction, *see* 8 U.S.C. § 1326(b)(1), or those deported after a conviction for an aggravated felony, *see* 8 U.S.C. § 1326(b)(2). In addition to a base offense level of eight, these offenders are eligible for sentencing enhancements of four levels under U.S.S.G. § 2L1.2(b)(1)(A) or sixteen levels under § 2L1.2(b)(1)(B). As a result, the "worst" offenders in the Central District of California may be subject to imprisonment for sentences as long as 125 months (assuming an offense level of 24 (base level 8 plus specific offense characteristics of 16) and a criminal history of category of VI). *See* U.S.S.G. ch. 5, pt. A.

Thus, because Banuelos–Rodriguez was arrested in the Central District of Califor-

nia, pled guilty to the crime of reentering the United States illegally, was eligible for the aggravated-felony enhancement under § 1326(b)(2) and U.S.S.G. § 2L1.2,[1] and fell into a criminal history category of V, the government sought a prison sentence between 70 and 87 months. Had Banuelos–Rodriguez been arrested in the Southern, Eastern, or Northern Districts of California, he would have been sentenced to a maximum of 5 years or 60 months of imprisonment, even though he pled guilty to the *same offense*, was sentenced under the *same Guideline*, and had the *same sentencing profile.* That is an unjustified sentencing disparity. It is a sentencing disparity that results from different plea-bargaining policies systematically applied district-wide, regardless of the specific "features" of a defendant's case. It is not the result of prosecutors exercising their discretion on a case-by-case basis. Nor is the reduction in the maximum sentence imposed by prosecutors in the Eastern, Southern, and Northern Districts the result of such permitted factors as the defendant's "acceptance of responsibility" under U.S.S.G. § 3E1.1 or "substantial assistance to the government" under U.S.S.G. § 5K1.1.

The standardized district-wide plea-bargaining policies were developed strictly to deal with the administrative pressures of prosecuting § 1326 offenders in California. "[I]llegal re-entry is the single most prosecuted federal offense in the state." Mrozek at 9. The costs and staffing needs to prosecute all § 1326 offenders have put such a strain on California U.S. Attorneys' Offices, *see id.,* that they were compelled to devise district-wide solutions. The solution chosen by the U.S. Attorneys' Offices in four neighboring federal districts in California is standardized plea-bargaining policies for § 1326 offenders. Three districts opted for one blanket policy, and the

fourth chose another. The sentences offered under these policies thus have nothing to do with the legitimate exercise of prosecutorial discretion in individual cases. Instead, the sentences offered arise from district-wide policies based on community demographics and U.S. Attorneys' Offices' differing administrative choices. These policies—not U.S.S.G. § 2L1.2—effectively make location of arrest the key factor impacting a defendant's sentence for illegal re-entry. As a result, they distort the "heartland" of § 2L1.2 cases in California and undermine the sentencing uniformity mandated by the Sentencing Commission.

### B. A Sentencing Court's Authority to Depart

The Sentencing Commission stated unequivocally "that sentencing is a judicial function and that the appropriate sentence in a guilty plea case is to be determined by the judge." U.S.S.G. ch. 6, pt. B intro., cmt. A sentencing court "must impose on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary case." *Koon,* 518 U.S. at 92, 116 S.Ct. 2035. But the sentencing court may depart from the applicable sentencing range if it " 'finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different than that described.' " *Id.* (quoting 18 U.S.C. § 3553(b)). An aggravating or mitigating sentencing factor that the Commission adequately took into consideration will be reflected "only in the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Id. A fortiori,* a factor bearing on a case that the Commission does not mention anywhere is of a kind that "the Commission did not adequately" consider in formu-

---

**1.** Banuelos–Rodriguez's sole aggravated felony conviction involved *one gram* of methamphetamine. Because of this conviction, his sentence under U.S.S.G. § 2L1.2 is automatically enhanced 16 levels. Guideline

§ 2L1.2 does not distinguish between aggravated felony convictions involving 100 kilos of a controlled substance and one gram of a controlled substance. The sentencing enhancement is the same.

lating the guidelines. Standardized plea-bargaining policies that vary from district to district in California and systematically alter the sentence imposed for illegal re-entry based on the location of the defendant's arrest constitute a factor that the Sentencing Commission never considered.

## C. Factors Considered in Departure Decisions

The majority opinion asserts that factors warranting departure can *only* flow from the conduct of the defendant himself. The majority is mistaken. The majority's assertion is based on an erroneous reading of *Koon* that first appeared in *United States v. Stevens,* 197 F.3d 1263 (9th Cir.1999). In *Stevens,* a three-judge panel stated: "In *Koon,* 518 U.S. at 104–05, 116 S.Ct. 2035, the Court explained that the proper comparison [for determining whether departure is permitted] is between the conduct of the defendant and the conduct of other offenders" convicted of the same offense. *Stevens,* 197 F.3d at 1268. This is a misstatement of the Supreme Court's description of the proper "heartland" departure analysis. In *Koon,* the Supreme Court *explicitly* stated that the departure analysis involves "a refined assessment of the *many facts bearing on the outcome*" of a case and comparing them "with the *facts of other Guideline cases.*" *Koon,* 518 U.S. at 98–99, 116 S.Ct. 2035, *quoted with approval in* U.S.S.G. § 5K2.0 cmt. At no point did the Court limit the "heartland" analysis involved in departure decisions to a comparison of "the conduct of the defendant and the conduct of other offenders," as the majority opinion asserts. To the contrary, the Supreme Court stated that the "relevant question" is "whether the particular factor is within the heartland *given all the facts of the case.*" *Koon,* 518 U.S. at 99–100, 116 S.Ct. 2035 (emphasis added).

The discussion in *Koon* on pages 104–05, 116 S.Ct. 2035 that is cited in *Stevens* concerns the Court's consideration of the question whether *Rodney King's miscon-*duct in provoking the officers' conduct may be considered a ground for downward departure. The Court stated that the "correct inquiry" to resolve *that* question would be to "compare[ ] official offenders who are provoked with official offenders who are not," as opposed to comparing them with "civilian offenders." *Koon,* 518 U.S. at 105, 116 S.Ct. 2035. Because "[t]he punishment prescribed by [the applicable guideline] contemplates unprovoked assaults," the Supreme Court concluded that the district court had the discretion to depart downward because of "[Rodney King's] misconduct in provoking the wrong." *Id.* Thus, *Koon* clearly stands for the proposition that conduct of others or circumstances beyond the control of a defendant may sufficiently affect the circumstances of a case to warrant a downward departure—especially if that factor is not contemplated by the applicable guideline.

The Court in *Koon* also emphasized that the Sentencing Commission did " 'not intend to limit the kinds of factors ... that could constitute grounds for departure in an unusual case.' " *Koon,* 518 U.S. at 93, 116 S.Ct. 2035 (quoting 1995 U.S.S.G. ch. 1 pt. A intro., cmt. 4(b)). The Court further explained that:

> The Commission ... says it has formulated each Guideline to apply to a heart-land of typical cases. Atypical cases were not "adequately taken into consideration," and factors that may make a case atypical provide potential bases for departure. Potential departure factors "cannot, by their very nature, be comprehensively listed and analyzed in advance," 1995 U.S.S.G. § 5K2.0, of course. Faced with this reality, the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear upon the decision to depart.

*Id.* at 94, 116 S.Ct. 2035.

Applying these rules to the defendants in *Koon,* the Court concluded that three factors that have nothing to do with the

defendants' conduct justified downward departure. Those three factors were: (1) that Rodney King's misconduct contributed significantly to provoking the officers' offense conduct; (2) that the extraordinary national media attention the case garnered made the officers "unusually susceptible to prison abuse"; and (3) that the decision of federal prosecutors to try the officers "following a state acquittal based on the same underlying conduct ... significantly burden[ed] the defendants." *Id.* at 103–05, 111–13, 116 S.Ct. 2035 (internal quotation marks omitted) (alteration in original).

Finally, the Guidelines themselves broadly define the factors that may warrant a departure. Under the "Other Grounds for Departure" section, the Guidelines provide that

[a]n offender characteristic or *other circumstance that is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range* may be relevant to this determination if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the "heartland" cases covered by the guidelines *in a way that is important to the statutory purposes of sentencing.*

U.S.S.G. § 5K2.0 (emphasis added). Sentencing uniformity is the fundamental purpose of the Sentencing Guidelines. Departures that advance this goal are therefore in harmony with the Sentencing Guidelines.

In determining whether a specific ground for departure is in fact permissible under the Sentencing Guidelines, the Supreme Court has directed sentencing courts to ask the following questions:

1) What *features of this case,* potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?

2) Has the Commission forbidden departures based on those features?

3) If not, has the Commission encouraged departures based on those features?

4) If not, has the Commission discouraged departures based on those features?

*Koon,* 518 U.S. at 95, 116 S.Ct. 2035 (quoting *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)) (emphasis added). The district court in the present case did not consider these factors when confronted with Banuelos–Rodriguez's motion for downward departure. Nor does the majority opinion in reviewing the district court's decision. My review of these factors convinces me that sentencing disparities for illegal re-entry among defendants sentenced in contiguous federal districts based on U.S. Attorneys' plea-bargaining policies can be a ground for departure in the appropriate case.

I first note that a disparity in sentencing among federal districts arising from plea-bargaining policies of U.S. Attorneys is not one of the factors forbidden by the Commission. *See* U.S.S.G. § 5H1.10, p.s. (forbidding "Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status" as grounds for sentencing departure). Nor is such a disparity specifically "discouraged" by the Sentencing Guidelines. *See Koon,* 518 U.S. at 95, 116 S.Ct. 2035 (discussing specific offender characteristics that are discouraged as bases for departure under the Sentencing Guidelines). On the other hand, sentencing disparities that result from disparate plea-bargaining policies in contiguous federal districts are not described as an "encouraged" basis for departure in the Sentencing Guidelines. *See, e.g.,* U.S.S.G. § 5K2.13, p.s. (encouraging departures based on a defendant's "significantly reduced mental capacity").

Disparity in sentencing for illegal re-entry among defendants sentenced in contiguous federal districts arising from the plea-bargaining policies of U.S. Attorneys is simply not a factor mentioned in the Sentencing Guidelines. Thus, the departure analysis turns to consideration of "the

structure and theory of both relevant individual guidelines and the Guidelines taken as a whole." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035 (internal quotation marks and citation omitted).

### D. Sentencing Guideline § 2L1.2

The structure and theory of U.S.S.G. § 2L1.2 suggest that a downward departure may be appropriate in this case. According to this guideline and the underlying statute, 8 U.S.C. § 1326, an alien's sentencing exposure for entering the United States illegally after being deported varies dramatically depending on the nature of the underlying conviction(s) that prompted his or her deportation. In general, if the alien was deported after "any" felony conviction, his or her offense level increases four levels. U.S.S.G. § 2L1.2(b)(1)(B). If the alien's underlying conviction was for an "aggravated" felony, his or her offense level increases sixteen levels. *See* U.S.S.G. § 2L1.2(b)(2)(A).

The theory behind this guideline is manifest in its structure: the more extensive a reentering alien's criminal history, the more severe the sentence. Conspicuously absent from the guideline is any reference to the location of arrest. It is simply not a factor in the guideline's sentencing calculus. The Commission apparently never contemplated that the sentencing calculus for illegal re-entry would vary among contiguous districts. Yet, because of the disparate plea-bargaining policies among contiguous districts in California, the single most influential factor in sentencing a defendant for violating § 1326 is the location of his or her arrest. The "worst offender" with a criminal history category of VI and an offense level of 24, who crosses an invisible county line

faces a maximum sentence in the Central District of 125 months, but only 60 months in the Southern, Eastern, or Northern Districts of California. For Banuelos–Rodriguez, crossing that invisible county line into the Central District of California meant that he faced a maximum sentence of 87 months, instead of 60 months. The structure and theory of § 2L1.2 certainly does not contemplate this sentencing disparity.[2] As such, it is unjustified and may warrant a downward departure.

### E. The Guidelines as A Whole

My examination of the structure and theory of the Sentencing Guidelines taken as a whole also leads me to conclude that sentencing disparities for § 1326 offenders arising from disparate district-wide plea-bargaining policies may warrant downward departure.

A central goal of the Sentencing Guidelines is to eliminate sentencing disparity. The purpose of the Sentencing Commission was to establish guidelines that "avoid[ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." 28 U.S.C. § 991(b)(1)(B). As the Commission explained, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. ch. 1, pt. A, p.s. 3.

"Reasonable sentence uniformity" cannot be successfully achieved for § 1326 offenders unless the applicable guideline, § 2L1.2, is "read and applied in a consis-

---

**2.** Indeed, Congress never contemplated such a wide disparity between the minimum and maximum range of a sentence either. To foster both sentencing uniformity and proportionality of punishment on an individual basis, Congress mandated the boundaries of any guideline sentencing range. *See* William W. Wilkins, Jr. & John R. Steer, *The Role of Sentencing Guideline Amendments in Reduc-*

*ing Unwarranted Sentencing Disparity*, 50 Wash. & Lee L.Rev. 63, 70–71 & n. 44 (1993). Section 994(b)(2) of Title 28 provides that "the maximum range established by [a guideline] shall not exceed the minimum term of the range by more than the greater of 25 percent or 6 months...." 28 U.S.C. § 994(b)(2). The difference between 60 months and 87 months exceeds those bounds.

tent manner." William W. Wilkins, Jr. & John R. Steer, *The Role of Sentencing Guideline Amendments in Reducing Unwarranted Sentencing Disparity*, 50 Wash. & Lee L.Rev. 63, 71 (1993) ("Wilkins & Steer").[3] Nevertheless, the U.S. Attorneys' Offices in contiguous districts in California are systematically reading and applying § 2L1.2 inconsistently by employing radically different plea bargaining policies in otherwise-similar cases. They do so not because defendants have accepted responsibility for their crimes, substantially assisted the government, or because other "features" of an individual defendant's case warrant disparate treatment. They do so because of the serious administrative strain that U.S. Attorneys' Offices in these four California districts face in order to prosecute the most prosecuted offense in the state, i.e., illegal re-entry.

As a result, these disparate plea-bargaining policies have distorted the "heartland" of cases under U.S.S.G. § 2L1.2 in the State of California. This is a highly unusual set of circumstances that render § 1326 cases "rare" and "atypical" within the meaning of the Guidelines. *See* U.S.S.G. § 5K2.0 cmt. The severity of the sentencing disparities, the lack of any connection between the disparities and the "features" of individual cases, coupled with the serious administrative strain on U.S. Attorneys' Offices in four districts in California persuade me that the district court has discretion to consider a downward departure in this case.

Nevertheless, the majority opinion repeatedly insists that recognizing the discretionary authority of a district court in the Central District of California to depart in a § 1326 case on this basis amounts to impermissible judicial interference with the "prosecutor's discretion regarding whom to prosecute, what charges to file, and whether to engage in plea negotia-

tions." *See* Majority Op. at 976. The law is indeed well-settled that "the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect[ ] ... is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors." *United States v. LaBonte*, 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997). But the sentencing disparities at issue here are not the result of the exercise of a prosecutor's charging discretion. They are the result of district-wide administrative decisions impacting defendants charged with the same offense and subject to the same enhancement factors. *See Almendarez–Torres v. United States*, 523 U.S. 224, 235, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (holding that violations of § 1326(a) and 1326(b) constitute the same offense and that subsections 1326(b)(1) and (b)(2) merely set forth the sentencing enhancement for violations of § 1326(a)).

Similarly, while I recognize that a prosecutor has broad discretion in adopting plea-bargaining practices, I am nonetheless mindful that the Sentencing Guidelines "are intended to ensure that plea negotiation practices ... do not perpetuate unwarranted sentencing disparities." U.S.S.G. ch. 6, pt. B, intro., cmt. To this end, a court may accept a plea agreement "if the court determines that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines." U.S.S.G. § 6B1.2(a) (policy statement). The Sentencing Commission, however, recognized "the difficulty anticipating problems in this area." U.S.S.G. ch. 6, pt. B, intro., cmt. For this reason, the Commission deemed its policy statements on plea agreements to be "a first step toward implementing 28 U.S.C. § 994(a)(2)(E). Congress indicated that it expects *judges* 'to examine plea agreements to make cer-

---

**3.** The authors of this article are Judge William A. Wilkins, Jr., Circuit Judge for the United States Court of Appeals for the Fourth Circuit and Chairman of the United States

Sentencing Commission; and John R. Steer, General Counsel, United States Sentencing Commission.

tain that prosecutors have not used plea bargaining to undermine the sentencing guidelines.'" U.S.S.G. ch. 6, pt. B, intro., cmt. (quoting S. Rep. 98–225, 98th Cong., 1st Sess. 63, 167 (1984), U.S.C.C.A.N. at 3246, 3350) (emphasis added).

In addition, the Sentencing Commission declared that imposing "substantive restrictions on judicial discretion would be premature at this stage of the Commission's work" and that "sentencing guidelines [in this area] are themselves to some degree experimental." *Id.* The Sentencing Commission also stated:

> The present policy statements [concerning plea agreements] move in the desired direction in two ways. First, the policy statements make clear that *sentencing is a judicial function and that the appropriate sentence in a guilty plea case is to be determined by the judge.* This is a reaffirmation of pre-guidelines practice. Second, the policy statements ensure that the basis for any judicial decision to depart from the guidelines will be explained on the record. Explanations will be carefully analyzed by the Commission and will pave the way for more detailed policy statements presenting substantive criteria to achieve consistency in this aspect of the sentencing process.

U.S.S.G. ch. 6, pt. B, intro., cmt. (emphasis added).

Despite the majority opinion's protestations to the contrary, *see* Majority Op. at 975–76, the Sentencing Commission explicitly wanted to eliminate "unwarranted sentencing disparity" stemming from the inappropriate exercise of *prosecutorial discretion in plea bargaining.* The Commission clearly stated that unjustified reductions in sentences granted by prosecutors in plea agreements "will tend to undermine the sentencing guidelines." U.S.S.G. § 6B1.2, cmt. (policy statement). More importantly, the Commission stated that it will look to the judiciary to ensure that plea bargains do not undermine the

Guidelines. By doing so, courts will alert the Commission to the need to adjust the relevant guidelines and policy statements. Indeed, "[t]he process of appellate review of sentences was designed both to ensure the appropriate application of the law and guidelines in the particular case and to aid the development of sentencing policy." Wilkins & Steer, 50 Wash. & Lee L.Rev. at 69–70 & n. 37.

Nevertheless, the majority opinion asserts that if a sentencing court were permitted to grant a departure to offset plea-bargaining practices that undermine sentencing uniformity, the Doctrine of the Separation of Powers would be violated. *See* Majority Op. at 976–77. This doesn't make sense, especially in light of the Commission's own policy statements as the above discussion makes clear. Moreover, the majority premises its entire Separation of Powers discussion on the mistaken belief that the departure sought here is to equalize the sentences of defendants who pled guilty to different crimes. Under *Almendarez–Torres,* that is not the situation. Section 1326 defendants in the four contiguous federal districts in California are charged with the same offense: illegal re-entry in violation of § 1326.

Thus, prosecutors are not exercising their charging discretion or authority to plea bargain on a case-by-case basis among co-defendants or co-conspirators. If they were, there is no question that departure to offset the unequal treatment of such defendants is not permitted. *See United States v. Mejia,* 953 F.2d 461, 468 (9th Cir.1992). "Basic notions of fairness[, however,] dictate that defendants should be sentenced in proportion to their crimes." *Id.* That is why "[t]he Sentencing Guidelines attempt to ensure that all defendants receive like sentences for like crimes." *Id.* When prosecutors' district-wide plea-bargaining practices frustrate such proportional sentencing results, departure may be warranted.

The government argues that each district's U.S. Attorneys' Office has the right to address their criminal problems differently. One cannot argue with that statement in the abstract. But the Sentencing Commission made it clear that the goal of national uniformity trumps "unbridled license to take community opinion and the incidence of particular types of crime into account" in determining the proper sentence for defendants convicted of the same offense. *United States v. Aguilar–Pena,* 887 F.2d 347, 352 (1st Cir.1989). This rule should apply whether the discretion of federal judges *or* prosecutors is at issue because permitting unjustified sentencing disparities for the same offense solely on the basis of "where the[ ] crimes occurred, would serve only to foster the very kind of wide variations in sentence severity which Congress apparently abhorred. Because both Congress and the Commission plainly intended the guidelines to be a means of eliminating regional disparity in sentencing ...," such disparities should not be countenanced. *Id.* at 353; *accord United States v. Hadaway,* 998 F.2d 917, 921 (11th Cir.1993); *United States v. Barbontin,* 907 F.2d 1494, 1499 (5th Cir.1990).

## CONCLUSION

Prosecutors in the Central, Southern, Eastern, and Northern Districts of California are using their authority to plea bargain on a wholesale, district-wide basis in a way that distorts the "heartland" of Guideline § 2L1.2 and defeats sentencing uniformity for violators of 8 U.S.C. § 1326. Under such unique circumstances, a district court should be able to exercise its discretion to depart downward · to correct an unjustified sentencing disparity if the case warrants it.

For the foregoing reasons, I would reverse the decision of the district court and remand so that the court may exercise its discretion and determine whether the circumstances of Banuelos–Rodriguez's case warrant a downward departure.